Wm. Matthew Ditzhazy, City Attorney (SBN 117914)
Noel Doran, Deputy City Attorney (SBN 222843)
CITY OF PALMDALE; and
Deborah J. Fox (SBN 110929)
dfox@meyersnave.com
Dawn A. McIntosh (SBN 162713)
dmcintosh@meyersnave.com
MEYERS, NAVE, RIBACK, SILVER & WILSON
333 South Grand Avenue, Suite 1670
Los Angeles, California 90071
Telephone: (213) 626-2906
Facsimile: (213) 626-0215

Attorneys for Plaintiff
CITY OF PALMDALE

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF PALMDALE, a charter city,<br><br>Plaintiff,<br><br>v.<br><br>CALIFORNIA HIGH-SPEED RAIL AUTHORITY, a public agency; ROELOF VAN ARK, Chief Executive Officer; and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO. 2:11-CV-01808-GEB-GGH<br><br>CITY OF PALMDALE'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>[Declarations, Request for Judicial Notice and Exhibits A-S submitted concurrently]<br><br>Hearing:<br>Date:      August 22, 2011<br>Time:      9:00 a.m.<br>Dept:      10 |

1    TO ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

2          YOU ARE HEREBY NOTIFIED THAT, on August 22, 2011, at 9:00 a.m.,

3    or as soon thereafter as counsel may be heard, in Department 10 of the above-

4    entitled Court, located at 501 I Street, Sacramento, California, plaintiff City of

5    Palmdale ("the City" or "Palmdale") will move, and hereby does move, this Court

6    for an order for a preliminary injunction prohibiting Defendants from undertaking

7    any activities in furtherance of a study of an alignment along the I-5 between

8    Bakersfield and Los Angeles ("the I-5 Study" or "the Grapevine Study") that would

9    be an alternative to the alignment selected as the Preferred Alternative in the

10   certified Final Programmatic EIR/EIS for the Proposed California High-Speed Train

11   System dated August 2005 and ordering any such activities currently underway to

12   immediately cease.  The City also moves this Court to enjoin Defendants from using

13   Proposition 1A funds and/or Federal Grant funds provided to the California High-

14   Speed Rail Authority by the Federal Railroad Administration pursuant to Agreement

15   No. FR-HSR-0009-10-01-01 to pay for any expenses associated with the Grapevine

16   Study.

17         This motion will be based on this notice of motion and motion, the Complaint

18   for Declaratory and Injunctive Relief for Misuse of Federal Grant Funds and State

19   Bond Funds, the declarations of Stephan Williams, Noel Doran and Deborah Fox

20   filed in support herewith, the Request for Judicial Notice filed concurrently

21   herewith, all exhibits filed concurrently herewith, and upon such other matters,

22   whether written or oral, as may be presented to the Court.

23   DATED: July 19, 2011              MEYERS, NAVE, RIBACK, SILVER & WILSON

24

25

26                                     By: _____/s/_____
                                            DEBORAH J. FOX
27                                          Attorneys for Plaintiff
                                            CITY OF PALMDALE
28

---

                                    1

TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 1

II.    FACTUAL BACKGROUND ........................................................................ 3

       A.     Programmatic Environmental Review Of The High-Speed Rail
              Project.................................................................................................. 3

       B.     Proposition 1A Bond Funds ................................................................ 5

       C.     Federal Grant Funding ........................................................................ 7

              1.     Statement of Work – Environmental Review ........................... 7

              2.     Statement of Work – Rights-of-Way Acquisition Support ........ 9

              3.     Allowable Costs........................................................................ 9

       D.     Scope Of Work For Regional Consultants In Phase 1 ........................ 9

       E.     The Authority's Improper Reconsideration Of The I-5
              Route/Grapevine Alignment .............................................................. 10

III.   PALMDALE IS ENTITLED TO A PRELIMINARY INJUNCTION...........11

       A.     Likelihood Of Success On The Merits ............................................. 11

       B.     The City Will Suffer Irreparable Injury............................................ 13

       C.     The Balance Of Equities Favors The City ........................................ 15

       D.     An Injunction Is In The Public Interest ............................................ 16

IV.    CONCLUSION ........................................................................................18

1

TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Weinberger v. Romero-Barcelo*,

5

    456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ....................................16

6

*Winter v. Natural Resources Defense Council, Inc.*,

7

    555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ................................11, 16

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CITY'S NOTICE AND MOTION FOR PRELIMINARY INJUNCTION; MEMO P&A

I.      *INTRODUCTION AND SUMMARY OF ARGUMENT*

The City of Palmdale ("the City" or "Palmdale") seeks an injunction prohibiting the California High-Speed Rail Authority from continuing to improperly and illegally use state and/or federal funds to conduct a study of an alignment for the California High-Speed Rail Project ("HSR Project") that was analyzed and rejected in 2005 and is not an authorized activity under either funding source.  Proceeding with this improper study could jeopardize both funding sources and the HSR Project itself.

Defendant California High-Speed Rail Authority ("the Authority") was established as an independent state authority pursuant to state legislation in 1996 and charged with planning, constructing and operating a statewide, inter-city high speed passenger train system ("HST system") to serve a mainline route between San Francisco and Los Angeles, as well as other major California cities along or connecting with the mainline route.  In 2005, after years of studying alternatives to the HSR Project, including improvements to highways and airports, and different conceptually defined HSR corridor alignment and station options, the Authority selected a specific corridor and alignment ("the Preferred Alternative") for project-level engineering and environmental review ("Phase 1").  The Preferred Alternative runs through the City of Palmdale and the Antelope Valley with a designated stop in Palmdale.  Two alignments down the I-5 corridor between Bakersfield and Los Angeles (the "I-5 Route" or "Grapevine Route") were evaluated as alternatives to the Palmdale/Antelope Valley alignment, but both were rejected because they failed to meet basic objectives of the HSR Project.

The Authority then obtained federal and state funds to complete project-level studies of the Preferred Alternative.  The goal was to begin construction of the HSR Project quickly, as early as 2012 in certain sections.  Suddenly, in May 2011, the Authority staff, none of whom was involved in the selection of the corridor and alignment in 2005, decided to reconsider one of the previously rejected alignments

1

1  down the I-5 corridor from Bakersfield to Los Angeles and to undertake a $700,000
2  study of the I-5 alignment ("the I-5 Study" or "the Grapevine Study") as part of that
3  process.

4      The federal grant does not authorize the Authority to conduct studies of
5  alternatives *to replace* any portion of the alignment already selected as the Preferred
6  Alternative, it only provides for project-level analysis and the development of
7  alternatives *within* the Preferred Alternative.  The Grapevine Route is not an
8  alternative *within* the Preferred Alternative, it is an alternative *to* a portion of the
9  Preferred Alternative.  The Grapevine Route runs from Bakersfield to Los Angeles
10 directly along the I-5 freeway, many miles to the west of the selected corridor which
11 bounds the Preferred Alternative and thus would impermissibly replace or eliminate
12 a portion of the Preferred Alternative (namely the Palmdale route).

13     Likewise, Proposition 1A also does not authorize the Authority to conduct the
14 I-5 Study.  Indeed, two years ago, the Authority's legal counsel (the California
15 Attorney General) advised the Authority that it would be unlawful to change the
16 Phase 1 corridor as defined in Proposition 1A or to eliminate any portion of the
17 Phase 1 route.  By undertaking the I-5 Study, however, the Authority seeks to do
18 just that – redefine Phase 1 by eliminating the segments from Bakersfield to
19 Palmdale and Palmdale to Los Angeles and replacing them with the I-5 or
20 Grapevine Route.

21     In short, despite the express language in the federal grants and state
22 proposition restricting use of those funds to selected routes and prohibiting their use
23 for alternative routes, such as the I-5 Route, the Authority audaciously intends to use
24 both funding sources to pay for the I-5 Study.  Both funding sources provide that the
25 Authority will be reimbursed for authorized expenses after they are incurred, so
26 there is nothing stopping the Authority from "spending" the money, then being told
27 the expense cannot be reimbursed or worse yet, having all federal and state funds for
28 the HSR Project revoked due to improper use.  The citizens of Palmdale and citizens

1   throughout California will be seriously and irreparably injured if the Authority's

2   improper actions are not stopped and result in the demise of the HSR Project.

3   II.      *FACTUAL BACKGROUND*

4         In June 2000, the Authority adopted the final business plan for an ambitious,

5   state of the art high-speed rail project to develop an economically viable high-speed

6   train ("HST") system over 700 miles long (1,127 kilometers).  The proposed HST

7   system will be capable of speeds in excess of 200 miles per hour (mph) and will

8   travel on a mostly dedicated system with fully graded-separated tracks with state-of-

9   the-art safety, signaling, and automated train control systems.  It is intended to

10  connect and serve the major metropolitan areas of California, extending from

11  Sacramento and the San Francisco Bay Area through the Central Valley to Los

12  Angeles and San Diego.  *See* Federal Railroad Administration's Record of Decision

13  ("ROD") for the Program EIR/EIS for the HSR Project, discussed *infra*, Exhibit B,

14  p. 023.[1]

15        A.      *Programmatic Environmental Review Of The High-Speed Rail Project.*

16        Shortly thereafter, the Authority, in conjunction with the Federal Railroad

17  Administration ("FRA"), began programmatic environmental review of the HSR

18  Project under the California Environmental Quality Act ("CEQA") and the National

19  Environmental Policy Act ("NEPA").[2]  The Authority and the FRA prepared a joint

20  programmatic environmental impact report/environmental impact statement

21  ("Program EIR/EIS") that evaluated numerous conceptual corridors and alignments as

22  well as station location options.  *See* the Program EIR/EIS at

23  http://www.cahighspeedrail.ca.gov/final_pgrm_eireisreport_vol1.aspx.

24  _____

25  [1] For ease of reference, the Exhibits follow the same numbering as in the Complaint
    – Exhibit B to the Complaint is also Exhibit B in this Motion.

26

27  [2] The FRA became involved because the Authority intended to seek federal funding
    for the HSR Project.  *See* FRA Record of Decision for Program EIR/EIS, Exhibit B.

28

1   The Program EIR/EIS specifically defines a conceptual corridor as a

2   geographic belt or band that follows the general route of a transportation facility

3   such as a highway or railroad (Program EIR/EIS, p. 13-3) and defines alignments as

4   the horizontal and vertical routes within a corridor (Program EIR/EIS, p. 13-1).  *See*

5   Program EIR/EIS, excerpts of which are filed concurrently herewith as Exhibit M,

6   pp. 427 and 429.  Notably, two alignments down the I-5 corridor between

7   Bakersfield and Los Angeles (the I-5/Grapevine Route) were rejected by the

8   Authority during programmatic environmental review, one of which followed the I-

9   5 through Santa Clarita. *See* Program EIR/EIS, Chapter 2, pp. 317-401 and Chapter

10   6, pp. 402-416, Exhibit M.  These I-5 Routes were considered as alternatives to the

11   Antelope Valley/Palmdale alignment which was eventually selected as part of the

12   Preferred Alternative.

13   Alternatives to the HST system such as improvements to highways and

14   airports were also considered in the Program EIR/EIS.  Station options considered

15   between Bakersfield and Los Angeles included the Palmdale Transportation Center,

16   the Sylmar Metrolink, Burbank Metrolink Media City and the Burbank Airport.  *See*

17   Program EIR/EIS, pp. 414-415, Exhibit M.

18   The Final Program EIR/EIS was completed and certified in 2005 for all

19   sections of the HSR Project except the Bay Area to Central Valley section.[3]  *Id.*

20   Immediately thereafter, the Authority adopted Resolution No. 05-01 and the FRA

21   adopted a Record of Decision which:

22   (a)   approved and selected the preferred high-speed train alternative

23   analyzed in the Program EIR/EIS;

24   ///

25

26   [3] A separate program EIR/EIS was prepared in 2008 for the Bay Area to the Central

27   Valley corridor.

28

1   (b)   eliminated corridors, alignments and station options evaluated in the

2   Program EIR/EIS from further consideration; and

3         (c)     approved the Preferred Alternative identified in the Program

4                 EIR/EIS, including the identified conceptual corridor, alignment

5                 and station options, for further project-level study and

6                 environmental review.

7   *See* Resolution No. 05-01 and the FRA's ROD, true and correct copies are found at

8   Exhibits A and B.  Translated this means that the Authority selected a single corridor

9   and alignment for the HSR Project, eliminating all other alignment and corridors

10  from further consideration, and authorized site specific environmental review and

11  engineering along the selected corridor/alignment in preparation for construction.

12  The selected alignment passes through Palmdale with a proposed station at the

13  Palmdale Transportation Center; it does not follow the I-5 Route.  *See* Program

14  EIR/EIS, Chapter 6, pp. 402-416, Exhibit M.

15        B.     *Proposition 1A Bond Funds.*

16        In 2008, the citizens of California adopted Proposition 1A which authorized

17  the expenditure of $9 billion in bond funds to complete project level environmental

18  analysis, engineering and construction of the HSR Project consistent with the

19  Program EIR/EIS.  Proposition 1A limits the bond funds for project-level review on

20  the corridor identified and adopted by the Authority in May 2007 as "Phase 1" of

21  the HSR Project.  *See* Proposition 1A, Sections 2704.01(f) and 2704.04(b)(2), a true

22  and correct copy is found at Exhibit E, p. 073; Phasing Plan Report, California

23  High-Speed Train Network, The Next Steps To Construction ("2007 Phasing Plan")

24  adopted by the Authority's Board of Directors ("Board") on May 23, 2007, a true

25  and correct copy of which is found at Exhibit R; and Minutes of the May 23, 2007

26  meeting of the Board adopting the 2007 Phasing Plan, a true and correct copy of

27  ///

28  ///

1  which is found at Exhibit S.  The Authority has defined the Phase 1 corridor as
2  running from Anaheim to San Francisco, passing through Palmdale.[4]  *See* the 2007
3  Phasing Plan for the HSR Project, Exhibit R; the Authority's application for grant
4  funds ("the Application"), submitted to the FRA in October 2009, which specifically
5  delineates the selected corridor, alignment and proposed stations, a true and correct
6  copy is found at Exhibit G; and Maps of Phase 1, true and correct copies of which
7  are found at Exhibits C and D.

8        Having defined Phase 1 as passing through Palmdale and obtaining state and
9  federal funds which are specifically constrained to funding the defined Phase 1
10  route, the Authority cannot now lawfully change the definition of Phase 1 to
11  eliminate the Palmdale portion of the route.  Indeed, the Authority has previously
12  been advised by its legal counsel, the California Attorney General, that Proposition
13  1A does not allow the Authority to change the Phase 1 corridor of the HSR Project
14  or eliminate any portion of it.  *See* Memorandum from George C. Spanos, Deputy
15  Attorney General, to Mehdi Morshed, Executive Director of the Authority, dated
16  January 25, 2010 ("Attorney General Memorandum"), a true and correct copy of
17  which is filed concurrently as Exhibit Q.  The only purpose of the I-5 Study is to
18  unlawfully eliminate the Palmdale portion of Phase 1 and replace it with the I-5
19  Route in direct contravention of the adopted ballot measure.

20        Moreover, while Proposition 1A specifically authorizes expenditures for
21  capital costs on a Fresno/Bakersfield/Palmdale/Los Angeles corridor, it excludes the
22  1-5 Route from the list of corridors for which this spending is authorized.
23  Proposition 1A, Section 2704.04(b)(3)(D), Exhibit E, p. 073.  Thus, the I-5 Study
24  would be analyzing a route for which capital expenditures are not allowed.

25

26  _____

27  [4] Phase 2 is defined as adding extensions north to Sacramento and south to San
Diego.  *See* Authority's Application to FRA, Exhibit G.

28

1 | Therefore, Proposition 1A funds may not be used for further study, consideration or
2 | construction of the I-5 corridor.

3 |        C.      *Federal Grant Funding.*

4 |        In September 2010, the FRA issued a Grant/Cooperative Agreement to the
5 | Authority for preliminary engineering and project level environmental analysis of
6 | the Phase 1 corridor under NEPA and CEQA.  *See* Grant/Cooperative Agreement
7 | No. FR-HSR-0009-10-01-00 (hereinafter "the Federal Grant"), a true and correct
8 | copy is found at Exhibit F; and Application, Exhibit G.  The Federal Grant provides
9 | funding pursuant to the American Recovery and Reinvestment Act of 2009
10 | ("ARRA").  *See* Exhibit F.

11 |        The Federal Grant authorizes funding in the amount of $194,000,000 and
12 | requires the Authority to provide alternative funding for an equal or greater amount,
13 | acknowledging that the Authority obtained the required matching funds via
14 | Proposition 1A.  *Id.*  The Federal Grant was amended on or about December 2010
15 | to, among other things, revise the Statement of Work which describes the activities
16 | for which the grant funds may and must be used.  *See* Amendment No. 1 to the
17 | Federal Grant (hereinafter "Federal Amended Grant"), Exhibit H.

18 |        1.      *Statement of Work – Environmental Review.*

19 |        The Statement of Work specifically identifies the corridor selected for further
20 | project level environmental review as passing through the City of Palmdale and
21 | identifies the following seven approved sections ("Approved Sections") of Phase 1
22 | of the HSR Project:

23 |             a.      San Francisco-San Jose (50 miles),
24 |             b.      San Jose-Merced Wye (120 miles),
25 |             c.      Merced-Fresno (60 miles),
26 |             d.      Fresno-Bakersfield (115 miles),
27 |             e.      Bakersfield-Palmdale (85 miles),
28 | ///

1   f. Palmdale-Los Angeles (60 miles) and

2   g. Los Angeles-Anaheim (30 miles).

3 *See* Federal Amended Grant, Attachment 3, pp. 192-193, Background and General

4 Objective, Exhibit H.  The Statement of Work authorizes the Authority to carry out

5 the necessary steps for completion of the seven project-level environmental studies

6 and describes the specific activities the Authority must undertake to complete these

7 documents.  Exhibit H, pp. 193-203.

8  The Description of Work, which is part of the Statement of Work, describes

9 the Alternatives Analysis authorized by the Statement of Work as follows:

10  The Authority, with FRA, will conduct an Alternatives Analysis (AA)

11  **in each Approved Section** to help identify the alignments and station

12  locations to carry forward in the environmental review.  The AA

13  process will define potentially reasonable and feasible project

14  alternatives, design options, and station locations that can meet the

15  NEPA Purpose and Need and CEQA project objectives while avoiding

16  or minimizing environmental impacts.  (The AA process is underway in

17  all seven [Approved] Sections and activities undertaken in developing

18  the alternatives analysis after the effective date of this Agreement are

19  potentially eligible under this Statement of Work.)

20 Exhibit H, p. 195, emphasis added.

21  Thus, the Statement of Work does not authorize development of alternatives

22 *to replace* any of the seven Approved Sections, only the development of alternatives

23 *within* the seven Approved Sections.  As to the Bakersfield-Palmdale and Palmdale-

24 Los Angeles Approved Sections – the I-5 Route/Grapevine alternative is not an

25 alternative *within* the defined Approved Sections, it would be an alternative *to* the

26 Approved Sections.  Therefore, further study of the I-5 Route is not within the

27 activities authorized in the Statement of Work.

28 ///

2.     *Statement of Work – Rights-of-Way Acquisition Support.*

Furthermore, the Description of Work requires the Authority to provide support for acquisition of rights-of-way ("ROW) for all seven Phase 1 Approved Sections by identifying parcels, documenting parcel requirements and developing a relocation plan for ROW acquisitions.  It also requires the Authority to prepare and deliver station area plans, ROW acquisition plans, ROW acquisition documents, ridership forecasts and construction contract documents ready for bid for each Phase 1 Approved Section, including Bakersfield-Palmdale and Palmdale-Los Angeles. Exhibit H, p. 202.  Thus, ROW acquisition support activities to be funded through the Federal Grant as amended are limited to such activities **within** the seven Approved Sections of Phase 1.

3.     *Allowable Costs.*

The Federal Grant defines "Allowable Costs" as those costs that conform with the Project description, the Statement of Work, and the Approved Project Budget and all other terms of the Federal Grant as amended.  *See* Federal Grant, Exhibit F, p. 094.  Therefore, the funds provided under the Federal Grant as amended may **only** be used for the activities described in the Statement of Work. The Statement of Work further explains that any expenses incurred by the Authority or its agents for activities that are not described in the Statement of Work shall not be reimbursable under the Federal Grant.  *See* Federal Amended Grant, Exhibit H, p. 204.  Further study of the I-5 Route is not an activity included within the Statement of Work and is not reimbursable under the Federal Grant.

D.     *Scope Of Work For Regional Consultants In Phase 1.*

The detailed description of the Scope of Work for the Regional Management Team and Regional Consultants for Phase 1 of the HSR Project includes project management, meetings and engineering and environmental review for the Los Angeles-Palmdale and Palmdale-Bakersfield Approved Sections.  *See* Federal Amended Grant, Exhibit 1 to the Statement of Work, Exhibit H; *see also* Contracts

9

1  issued to the Regional Consultants for the Los Angeles-Palmdale and Palmdale-
2  Bakersfield Approved Sections, true and correct copies of which are found at
3  Exhibits I and J.  The Regional Consultant's "Scope of Work and Deliverables"
4  states that the focus of the Regional Consultant's work will be on the selected
5  corridor identified in the Program EIR/EIS and the FRA's ROD (both November
6  2005).  Exhibit 2 to the Statement of Work, Exhibit H.

7       The selected corridor identified in the Program EIR/EIS and the FRA's ROD
8  includes the seven Approved Sections identified in the Statement of Work.  *See*
9  Program EIR/EIS, Chapter 6, pp. 402-416, Exhibit M; and FRA's ROD, Exhibit B.
10 The I-5 Route/Grapevine Alignment is *not* within the selected corridor.

11      Further, the Regional Consultant "Scope of Work and Deliverables" also
12 states that the Regional Consultant's work shall be consistent with and build upon
13 the Authority's previous work, including the Program EIR/EIS and the technical
14 reports that support that document.  *See* Federal Amended Grant, Exhibit 2 to the
15 Statement of Work, Exhibit H.  It further mandates that Regional Consultants shall
16 not duplicate work previously done by the Authority, such as a study of the I-5
17 Route/Grapevine Alignment.  *Id.*

18      E.    *The Authority's Improper Reconsideration Of The I-5 Route/Grapevine*
19           *Alignment.*

20      In May 2011, the Authority decided to reconsider the I-5 Route, which was
21 studied and rejected years ago in the Program EIR/EIS, as an alternative to the
22 Bakersfield-Palmdale and Palmdale-Los Angeles Approved Sections of the
23 Preferred Alignment.  *See* Memorandum from C. Michael Gillam, Deputy Program
24 Director, Southern California, and Andy Althorp, Regional Manager, Palmdale to
25 Los Angeles Section, to Roelof van Ark, Chief Executive Officer, Southern
26 California High-Speed Rail Authority, regarding Proposal to Reintroduce Study of
27 an (I-5) Grapevine Alignment Alternative between Bakersfield and Sylmar, dated
28 May 4, 2011, a true and correct copy of which is found at Exhibit N; *see also*

10

1  Program EIR/EIS, Chapter 2, pp. 317-401 and Chapter 6, pp. 404-411, Exhibit M.

2  As part of this "reconsideration," the Authority is currently undertaking a new

3  $700,000 study of the I-5 Route/Grapevine Alignment ("the I-5 Study").  *See* letter

4  to van Ark, Chief Executive Officer, Southern California High-Speed Rail

5  Authority, from Wm. Matthew Ditzhazy, City Attorney, City of Palmdale, dated

6  June 2, 2011, a true and correct copy of which is found at Exhibit K and letter to

7  Dawn McIntosh, Meyers Nave, from Amy Winn, Deputy Attorney General, dated

8  June 17, 2011, a true and correct copy of which is found at Exhibit L.

9        The Authority has estimated the cost for the I-5 Study at $700,000.  *See* email

10  from Jeffrey M. Barker, California High-Speed Rail Authority, to Laurie Lile, City

11  of Palmdale, dated May 27, 2011, a true and correct copy of which is found at

12  Exhibit O.  The Authority is financing the I-5 Study with federal ARRA funds

13  (Amended Grant funds), specifically from the budget for regional consultants, and

14  state Proposition 1A funds, split 50/50.  *Id.*  However, the I-5 Study is not within the

15  specific, detailed, authorized activities for either funding source.

16  III.    *PALMDALE IS ENTITLED TO A PRELIMINARY INJUNCTION*

17        The City is entitled to a preliminary injunction when it establishes that (1) it is

18  likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the

19  absence of preliminary relief, (3) the balance of equities tips in the City's favor, and

20  (4) an injunction is in the public interest.  *Winter v. Natural Resources Defense*

21  *Council, Inc., et al*., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).  All four

22  factors are met entitling the City to this extraordinary relief.

23        A.    *Likelihood Of Success On The Merits.*

24        First, the City is likely to succeed on the merits.  The Authority and the FRA

25  adopted the final Program EIR/EIS in 2005 and selected the Bakersfield-Los

26  Angeles alignment through the Antelope Valley and Palmdale as part of the

27  Preferred Alternative.  *See* Factual Background, subsection A; *see also* Program

28  EIR/EIS, Chapter 6A, pp. 417-426, Exhibit M.  The Authority made it clear in the

1  final Program EIR/EIS that it *would not* investigate the I-5 Route or other rejected

2  alignments in the project-level environmental analysis. *See* Program EIR/EIS,

3  Chapter 6A, p. 417, Exhibit M. The Authority's current effort to undertake a study

4  of the I-5 Route is a blatant violation of this commitment in the Program EIR/EIS.

5      The Authority's application for federal grant funds sought funds to complete

6  preliminary engineering and project-level environmental review to further refine the

7  HSR Project within the selected corridor and alignments identified as the Preferred

8  Alternative in the Program EIR/EIS, more recently identified as Phase 1. *See*

9  Application, Exhibit G. The Federal Grant as amended authorizes the Authority to

10  use the awarded federal grant funds for **only** those limited purposes called out in the

11  Federal Grant as amended and specifically states that any expenses incurred by the

12  Authority for tasks or studies outside the scope of the grant documents *are not*

13  *reimbursable*. *See* Federal Amended Grant, Exhibit H, p. 204.

14      Authorized actions include project-level engineering and environmental

15  analysis of the Bakersfield-Palmdale and Palmdale-Los Angeles Approved Sections.

16  *Id.* Undertaking a new study of the I-5 Route which was rejected in the Program

17  EIR/EIS and is not within the selected corridor and alignment for Phase 1 is most

18  definitely *not* within the scope of the authorized actions. *Id.*

19      Proposition 1A similarly limits use of the state bond funds to activities

20  undertaken by the Authority to complete site specific engineering and environmental

21  analysis for Phase 1 along the selected corridor and alignments in preparation for

22  construction. *See* Proposition 1A, Exhibit E. It also allows capital expenditures for

23  seven listed corridors, a list which includes the Palmdale route, but not the I-5

24  Route. *Id.* Since the I-5 Study is not part of Phase 1 or related to the seven listed

25  corridors, Proposition 1A funds may not be used for the I-5 Study.

26      Furthermore, the Federal Grant referenced the Authority's acquisition of state

27  bond funds through Proposition 1A as satisfaction of the prerequisite that the

28  Authority provide 50% of the funding for the HSR Project from state or private

1   sources.  *See* Federal Grant, Exhibit F.  Therefore, since the Proposition 1A funds

2   are not available for the I-5 Study, this prerequisite for use of the Federal Grant

3   funds is no longer satisfied.

4         If the Authority proceeds with the I-5 Study, it will incur $700,000 in debt

5   that will not be reimbursable under the Federal Amended Grant or through

6   Proposition 1A bond funds.  This will cripple the HSR Project and deal another

7   devastating blow to the state budget.  Furthermore, the FRA could revoke the

8   federal grant funds entirely due to misuse by the Authority, which would eliminate

9   half of the existing funding for the project and quite possibly result in the demise

10  of the HSR Project in its entirety.  This is precisely the sort of serious

11  mismanagement the Legislative Affairs Office ("LAO") warned about in its report

12  on the HSR Project released earlier this year.  *See* LAO Report dated May 10,

13  2011, filed concurrently as Exhibit P.

14        The California Attorney General previously concurred in the legal merit of the

15  City's claims when it advised the Authority in 2010 that Proposition 1A did not

16  allow the Authority to change or redefine Phase 1.  *See* Attorney General

17  Memorandum, Exhibit Q.  Thus, it is highly likely that the City will succeed on the

18  merits in establishing that the I-5 Study cannot be funded by, and jeopardizes, current

19  state and federal funding sources for the HSR Project.

20        B.    *The City Will Suffer Irreparable Injury.*

21        Second, the City will suffer irreparable injury if a preliminary injunction is

22  not granted.  If the Authority proceeds with and completes the I-5 Study, the entire

23  HSR Project will be jeopardized and the funding stripped away.  The $700,000

24  study is not authorized under either of the funding sources the Authority plans to use

25  to pay for it, which will inevitably result in saddling the state with nearly $1 million

26  in additional debt while the Legislature is cutting teachers and police officers in an

27  effort to deal with the state's existing, monstrous debt.

28  ///

CITY'S NOTICE AND MOTION FOR PRELIMINARY INJUNCTION; MEMO P&A

1    The HSR Project will provide tremendous benefits for the citizens of
2    Palmdale.  The City has invested significant time and money in developing
3    Palmdale as a multi-modal hub in anticipation of the HSR Project passing through
4    the City.  *See* Declaration of Stephen H. Williams, City Manager, City of Palmdale,
5    submitted concurrently.  The Palmdale HSR station would occur at the confluence
6    of the Metrolink passenger rail line, the High Desert Corridor freeway connection
7    between State Route 14 and Interstate 15, the future alignment of the privately
8    funded Desert Xpress high-speed rail system providing inter-state service to Las
9    Vegas, future connection to Palmdale Regional Airport, local and commuter bus
10   service, bike lanes, and regional arterial streets.  *Id.* at ¶ 10.  Within the next few
11   months a large-scale transit oriented multifamily development project will begin
12   construction within walking distance of the future Palmdale High-Speed Rail
13   Station.  The Palmdale Transit Village is a 156-apartment/121 townhome
14   development, which would offer a solution for both traffic and affordable housing
15   challenges.  *Id.* at ¶ 11.  The major appeal of this housing project is the future high
16   speed rail connection with commuter destinations.  *Id.*

17   The Antelope Valley also has a huge military and aerospace presence.  The
18   military and aerospace facilities and installations include: Edwards Air Force Base,
19   Air Force Plant 42 in Palmdale, NASA Dryden Flight Research Center at Edwards
20   AFB, NASA Dryden Flight Operations Facility at Plant 42 in Palmdale, Lockheed
21   Martin, Boeing, Northrop Grumman, Scales Composites, and many others.  There
22   are thousands of military personnel, government employees and contractors, and
23   aerospace workers traveling daily to and from places in other parts of California and
24   Palmdale.  NASA has facilities in Pasadena and the San Jose area that would be
25   more accessible to local NASA staff.  *Id.* at ¶ 12.

26   The Antelope Valley currently supports a population of 500,000 residents,
27   and it is one of the few locations in Los Angeles County and Southern California
28   with the potential for considerable growth.  *Id.* at ¶ 5.  The residents of Antelope

14

1   Valley are predominantly commuters.  These commuters would benefit greatly from

2   the HSR Project which stops in Palmdale and provides connectivity to the Greater

3   Los Angeles areas.  Nearly 71,000 workers travel into Greater Los Angeles from the

4   Antelope Valley each day.  *Id.* at ¶ 6.

5         In all, 42% of Lancaster and 53% of Palmdale working residents commute to

6   the Greater Los Angeles area.  The average daily commute times for Palmdale and

7   Lancaster workers are 89 minutes and 67 minutes, respectively. The average daily

8   commute for AV communities in Kern County is 52 minutes.  Approximately

9   63,000 workers from Palmdale/Lancaster sub-region spend at least an hour each day

10  on the road; of those, 38,000 spend two or more hours commuting.  *Id.*  Although

11  the Antelope Valley residents are predominantly commuters into the Greater Los

12  Angeles areas, there is one main freeway (Freeway 14) that connects AV to the

13  Greater Los Angeles areas.  The Antelope Valley has very few transportation

14  options for its commuting residents.  *Id.* at ¶ 7.

15        The HSR Project has been planned and designed to ease traffic congestion on

16  roads throughout the state, provide an economical travel alternative to air

17  transportation which is becoming exceedingly expensive, reduce air pollution and

18  greenhouse gas emissions, make it easier and more economical to visit relatives and

19  friends in other areas of the state.  *See* Program EIR/EIS.  If the HSR Project is

20  jeopardized or terminated due to the Authority's unauthorized study of the I-5 Route,

21  this would be devastating to the citizens of Palmdale and citizens throughout

22  California.

23        C.    *The Balance Of Equities Favors The City.*

24        The Authority will suffer no harm if it is forced to abandon or postpone this

25  ill-conceived, recycled study of the I-5 Route.  The I-5 Route was previously

26  rejected because it did not meet the basic project objectives of the HSR Project –

27  maximizing intermodal opportunities, maximizing connectivity and accessibility,

28  ///

1   and providing transit connections and multi-modal stations.  *See* FRA's ROD,

2   Section 6.1, p. 030, Exhibit B.

3        As discussed above, the City and its residents, as well as the citizens and

4   visitors to the entire Antelope Valley, will be significantly harmed if the injunction is

5   not granted.  Therefore, the balance of equities clearly favors granting the injunction.

6        D.    *An Injunction Is In The Public Interest.*

7        Fourth, an injunction is in the public interest.  The U.S. Supreme Court has

8   explained that "[i]n exercising their sound discretion, courts of equity should pay

9   particular regard for the public consequences in employing the extraordinary remedy

10  of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798,

11  72 L.Ed.2d 91 (1982); *see also Winter*, 555 U.S. 7.  This factor weighs heavily in

12  the City's favor because the public will clearly benefit from the issuance of the

13  injunction as discussed extensively above.

14       In addition to the significant public interest benefits discussed, the

15  Authority's Application to obtain federal grant funds explains additional benefits

16  to the citizens of Palmdale and other Californians from the successful completion

17  of the HSR Project.  *See* Application, Exhibit G.  Some of these benefits are as

18  follows:

19       • High-speed trains will alleviate the need to build – at a cost of nearly

20  $100 billion – about 3,000 freeway miles, five airport runways and 90 departure

21  gates over the next two decades, each with significant environmental and social

22  challenges. A statewide HST system – already subjected to environmental review –

23  will meet that need at about half the cost. Significantly, the HST Project has the

24  support of major California airport operators, including Los Angeles, San Francisco

25  and San Diego international airports.  Application, Exhibit G, p. 142.

26       • The California HST Full System will build nearly 800 miles of new rail

27  infrastructure separated from vehicular road traffic and conventional freight and

28  passenger trains, allowing operations at up to 220 mph of state-of-the-art, electrically

16

1  powered, high-speed, steel-wheel-on-steel-rail technology, including state-of-the-art

2  train control and communications systems. Safety and reliability of intercity

3  passenger service in California will be significantly improved.  *Id.* at p. 149.

4         • The California HST will decrease the cost and time of travel for all

5  markets served. For the 75% of passengers attracted from driving, the California

6  HST will save half or more of the trip time; in the example of the Los Angeles

7  Basin to San Joaquin Valley market, the 8.3 million yearly riders, nearly all drawn

8  from auto, will save over 1 billion minutes of travel time. And the 2005 cost of the

9  HST trip in this market of around $40 is also below the driving cost of around $50,

10  saving around $80 million per year.  *Id.* at p. 150.

11        • In the year 2030, the full California HST will create an estimated $11

12  billion in direct benefits to its riders, to drivers and air passengers who experience

13  less congestion, and to the state as a whole in pollution reduction and accident

14  reduction. In five years of operation, the benefits will exceed the cost of building the

15  line and operating it.  In economist's terms, California will realize $150 billion in

16  present value of net benefits by 2050 – nearly triple the total present value of the

17  cost of the project.  Not only will high-speed train passengers benefit from the

18  system, more than a third of the benefits will be accrued by air and auto travelers in

19  the form of reduced delays, reduced air pollution, and reduced auto accidents and

20  fatalities. *Id.* at p. 150.

21        • Operation of Phase 1 System service will create a strong economic

22  stimulus from the improvements in transportation efficiency. Scaling from the

23  estimates in the 2005 Statewide Program EIS/EIR of an additional 450,000 jobs in

24  year 2035 from the Full System's operation, Phase 1 System operations could

25  provide half to 2/3 of that jobs stimulus or 225,000 to 300,000 permanent jobs by

26  2035.  Around 4,000 of them would be from the operation and maintenance of the

27  high-speed train itself, a smaller number of jobs would be created in the supply and

28  ///

1   service industry, and the great majority of new jobs would be in the broader

2   economy. *Id.* at p. 153.

3          • The Full System high-speed train program will reduce oil consumption

4   by 12.7 million barrels of oil per year in 2030. As documented in the Bay Area –

5   Central Valley Program EIS/EIR, this is the savings from diverting air and auto

6   passengers to the electrified HST, which is anticipated to be powered entirely from

7   renewable sources. The California High-Speed Rail Authority Board has adopted

8   the goal of relying on renewables, and the industry is expected to develop sufficient

9   capacity and reliability to provide power from renewables to the HST service at a

10  relatively small premium to fossil fuel sourced power. *Id.* at p. 154.

11         The Authority's undertaking of an unauthorized nearly $1 million study to

12  reconsider a previously analyzed and rejected route, with no source of funding to

13  pay for it, places the entire HSR Project at jeopardy and recklessly risks all of these

14  benefits that could and would accrue to the citizens of Palmdale and the state of

15  California.

16  IV.   *CONCLUSION*

17         For the reasons set forth above, the City respectfully requests that this

18  Honorable Court grant the City's request for a preliminary injunction against

19  Defendants precluding and immediately ceasing the I-5 Study and precluding

20  Defendants from using funds from the Federal Grant as amended and/or Proposition

21  1A for the I-5 Study.

22

23  DATED: July 19, 2011          MEYERS, NAVE, RIBACK, SILVER & WILSON

24

25                               By: _____/s/_____

26                                    DEBORAH J. FOX
                                      Attorneys for Plaintiff
27                                    CITY OF PALMDALE

28  1671534.1/1206.017

CITY'S NOTICE AND MOTION FOR PRELIMINARY INJUNCTION; MEMO P&A